UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOE ISEMAN, a married individual,<br><br>                  Plaintiff,<br><br>     v.<br><br>DIGITAL RIVER, INC., a Delaware state corporation, doing business in Washington state,<br><br>                  Defendant. | CASE NO. C10-1210-RSM<br><br>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter comes before the Court upon Defendant's unopposed motion for summary judgment (Dkt. No. 44). For the reasons set forth below, Defendant's motion is GRANTED.

## II. DISCUSSION

**A. Factual Background**

Defendant Digital River, Inc. ("DRI") is in the business of designing, creating, and maintaining retail websites. DRI employs sales personnel to obtain accounts of software

publishers, hardware manufacturers and retailers who wish to run retail websites using DRI's services.

Plaintiff Joel Iseman was hired by DRI on May 31, 2005 as Director of Business Development, largely to solicit Microsoft accounts. Plaintiff's written offer stated that he would receive a base salary plus commissions based on the "current commission plan". Dkt. No. 11, ¶ 8 & Ex. 1. The letter referenced the plan as "attached," though neither Iseman nor DRI maintained the two documents together. *Id.*; Dkt. No. 49, Ex. 2 at 7:11-8:4, 11:11-13:1.

Generally speaking, DRI's commission plans vary from year to year. Which year's commission plan applies to which account is determined by the year in which the contract is signed, although commissions are due only when the website associated with the account goes "live". Dkt. No. 49, Ex. 2 at 9:2-14, 85:9-15; Dkt. No. 11, ¶13. Commissions are always paid out for a 12-month period after the site is up and running. Dkt. No. 49, Ex. 2 at 85:9-13.

In 2006 and 2007, Tom Venable, Senior Vice President of Sales, issued specific compensation plans to his direct reports, including Plaintiff Iseman, which included commission, bonuses, or some combination of the two. In 2006, Iseman received a document entitled "Objective and Comp Plan for 2006" (the "2006 plan"). Dkt. No. 49, Ex. 2 at 18:23-19:8 & Dep. Ex. 2. The 2006 plan consisted entirely of bonuses to be paid upon achievement of specific goals, or "MBOs," which stands for Management by Objective. *Id.* The 2006 plan does not reference any commissions or any other compensation plans. *Id.*

Cristin Miller, Sales Operations Coordinator, was responsible for calculating the commissions for Iseman's group. Dkt. No. 46, ¶¶ 1, 3. To do so, Miller relied on the individual's compensation plan, the applicable client contracts, revenue numbers and website "live dates". *Id.* at ¶ 4. Miller lacked the authority to vary from the compensation agreement

unless directed to do so in an email from an upper-level manager such as Tom Venable, Senior Vice President Sales, Don Peterson, Senior VP of Global Sales, or David Woolenberg. *Id.* at ¶¶ 7, 9. Miller asserts that she never received any instructions to pay Iseman commissions in 2006, did not pay him any such commissions, and was not aware that he was owed any commissions from that year. *Id.* at ¶ 13.

In 2007, DRI changed its compensation plan as per the usual custom. In February 2007, Woolenberg emailed Iseman a spreadsheet outlining his 2007 compensation plan (the "2007 plan"). Dkt. No. 49, Ex 2 at Dep. Ex. 3. The 2007 plan contains MBOs like the 2006 plan, but also provides for specific commission for Office Host in 2007 and for any new Microsoft business groups launched in 2007. *Id.* The plan makes no reference to any other compensation agreement. *Id.*

Contemporaneous evidence suggests that in 2007, Iseman understood that the 2007 plan referenced above was the only plan that applied to his compensation. In May 2007, Iseman was hit by a car while riding his bike and sued the driver for damages. Dkt. No. 49, Ex. 1, 30:1-6. In his deposition for that lawsuit, Iseman testified that he would have been entitled to a 4% commission on three accounts that he was unable to sign because of his injuries. Dkt. No. 49, Ex. 1 at 43;7-16; 46:8-47:1. The 4% commission is the commission listed in the 2007 plan. Dkt. No. 39, Ex. 2 at Dep.Ex. 3. In addition, Iseman sent an email to Woolenberg asking him to review and sign a letter supporting Iseman's claim for lost income. In that email, Iseman stated, "I am attaching my 2007 plan," and attached the 2007 plan. Dkt. No. 49, Ex. 2 at Dep. Ex. 6. Neither the email nor the attachment referenced any other compensation plans, nor did Iseman mention any underpaid commissions. Finally, each month, starting in May 2007, Miller emailed Iseman with his commission report for the prior month and asked him if he saw any mistakes.

Dkt. No. 46, ¶ 9; Dkt. No. 49, Ex. 2 at 107:8-16. Sometimes Iseman would respond that something had been missed, but he never told Miller or anyone else at DRI that he was not receiving the commissions that are the basis of this lawsuit. Dkt. No. 46, ¶ 5; Dkt. No. 49, Ex. 2 at 62:8-22.

In 2008, DRI began issuing written compensation plans that employees signed and returned to human resources. Dkt. No. 47, ¶ 9. DRI issued Iseman a written plan for 2008 (the "2008 plan"). The 2008 plan attached the company-wide 2007 standard commission compensation plan because the standard commission compensation plan had not changed for 2008. *Id.* at ¶ 19. The 2008 plan also provided that, "If your employment terminates for any reason, your entitlement to commissions ends on your last day of employment." Dkt. No. 49, Ex. 2 at Dep. Ex. 9.

In 2009, Iseman received a new written compensation plan, similar to the one he received in 2008. Dkt. No. 49, Ex. 2 at Dep. Ex. 13. The 2009 plan also provided that Iseman's entitlement to commissions would end on the last day of his employment. *Id.*

Iseman was ultimately terminated in January 2010. Leading up to his termination, Iseman had been removed from the Microsoft account and assigned to work with computer games. Dkt. No. 11, ¶ 11. At the end of 2009, Iseman was placed on a performance improvement plan and his employment was finally terminated on January 14, 2010. *Id.* at 113:7-12; Dkt. No. 49, Ex. 2 at Dep. Exs. 21-23 & 26.

Later that year, Iseman sued DRI and the suit was removed to federal court on July 27, 2010. Iseman filed an amended complaint on December 14, 2010. The thrust of Iseman's amended complaint is that he was entitled to commissions in 2006 and 2007 in accordance with the company-wide standard commission compensation plan, in addition to the MBOs and

commission rates that were specified under his individualized compensation plans for those years. He also alleges that other underpayments or non-payments occurred. Iseman brings causes of action against DRI for breach of contract, violation of RCW 49.48 *et seq.*, violation of RCW 49.52.50, quantum meruit, and unjust enrichment.

Between March and November of 2011, the parties engaged in discovery. On November 14, 2011, Plaintiff filed a motion to compel. Dkt. No. 38. The next day, Plaintiff filed a motion for extension of time to complete discovery. Dkt. No. 40. On November 21, 2011, Plaintiff filed a response to Defendant's motion to compel. Dkt. No. 41. Nothing has been filed by Plaintiff in this matter since that date.

Plaintiff did not file replies in connection with either of Plaintiff's November motions, both of which were due on December 2, 2011. On January 13, 2011, DRI filed a motion for summary judgment on all of Plaintiff's claims, which is the basis of this order. Dkt. No. 44. Consistent with Plaintiff's disappearance from his own lawsuit, Plaintiff has not filed any response to DRI's motion for summary judgment. On February 22, 2012, the Court entered an order to show cause why Plaintiff's lawsuit should not be dismissed for failure to prosecute. Dkt. No. 50. Plaintiff was given seven days to respond to the order. Plaintiff did not respond to the Court's order.

### III. ANALYSIS

1. <u>Summary Judgment Standard</u>

Under this Court's local rules, "[i]f a party fails to file papers in opposition to a motion, such failure may be considered by the court as an admission that the motion has merit." Local Rule CR 7(b)(2). Notwithstanding this rule, an unopposed motion for summary judgment presents a special case. A district court may not grant an unopposed motion for summary

judgment solely because the opposing party has failed to file an opposition. *See Cristobal v. Siegel*, 26 F.3d 1488, 1494-1495 & n.4 (9th Cir. 1994). *See also* Fed. R. Civ. P. 56, advisory committee note of 2010 ("summary judgment cannot be granted by default even if there is a complete failure to respond to the motion…"). The Court may only grant summary judgment if "the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (*citing F.D.I.C. v. O'Melveny & Myers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994)). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

The Court must draw all reasonable inferences in favor of the non-moving party. *See F.D.I.C. v. O'Melveny & Myers*, 969 F.2d at 747. However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If a party ... fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Whether to consider the fact undisputed for the purposes of the motion is at the court's discretion and the court "may choose not to consider the fact as undisputed, particularly if the court knows of record materials that should be grounds for genuine dispute." Fed. R. Civ. P. 56, advisory

committee note of 2010. On the other hand, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252.

2. <u>Breach of Contract Claim</u>

Iseman's breach of contract claim appears to consist of three separate issues. First, Iseman alleges he was subject to two compensation plans in addition to the 2006 and 2007 individualized plans and that he is owed commissions under those additional plans. Second, Iseman claims that he was not compensated for all of the Microsoft Office websites. Third, Iseman alleges that he should have received commissions for the Employee Home Use Program ("EHUP"). As the Court details below, and because Iseman has completely failed to respond to Defendant's motion for summary judgment, Iseman has failed to produce any evidence as to each of these issues. As a result, no reasonable jury could find in favor of Plaintiff on his breach of contract claim. *See Anderson,* 477 U.S. at 252 ("[T]here must be evidence on which the jury could reasonably find for the plaintiff.").

   *a. 2006 & 2007 Compensation Plans*

Iseman has produced no evidence that he signed or was subject to any compensation plans in 2006 or 2007 other than those produced by DRI. He has not provided any written documents or any testimony from any witness that would support his allegation that he was subject to alternate compensation plans, or even that *he believed* that he was subject to any additional compensation plans during his tenure at DRI. Iseman asserts that he spoke with Venable and Peterson about his unpaid commissions. He claims he asked each of them, in separate conversations, where his "big comp checks" were and both Venable and Peterson responded, "Wait and see." However, Iseman has produced no evidence to support this allegation. Iseman also points to the fact that the 2007 general compensation plan was attached

to his individualized 2008 compensation plan. He argues (in his Motion to Compel, *see* Dkt. No. 39 & Part II(D), *infra*) that this is evidence that similar general compensation plans must have been attached to his individualized plans for 2006 and 2007. Again though, Iseman cannot describe the contents of these purported additional plans and has produced no evidence of their existence.

On the other side of the ledger, DRI has produced ample evidence that, in 2006 and 2007, Iseman was only subject to the individualized plans that it produced in this litigation. DRI explains that Iseman's superiors recognized that a Microsoft account would be difficult to secure within the first year of Iseman's employment. As a result, Iseman was compensated in 2006 for achieving certain milestones that fell short of securing the Microsoft business – through the so-called MBOs. Then, in 2007, Iseman was offered compensation in the form of a specific mix of MBOs and commissions. While DRI could have *also* offered Iseman the standard commission rates that it offered to other salespeople not working on the Microsoft accounts, there is no evidence that this is what DRI in fact did. Additionally, other employees' contracts suggest that, had DRI and Iseman agreed that Iseman would receive additional commissions beyond those which were provided for in his individualized plans, the individualized plans would have included some indication to that effect. For example, Woolenberg's 2006 compensation plan states, "Any non-Microsoft Phase III Deals Closed will be completed under the 2006 new Sales Comp Plan – Attached." The 2006 and 2007 plans offered to Iseman did not include any such references.

Indeed, Iseman was paid in 2006 and 2007 according to the MBOs and commission rates set forth in the 2006 plan and the 2007 plan. The evidence suggests that Iseman expected he would receive this level of compensation and was not expecting any additional commissions.

Iseman testified during his 2009 personal injury lawsuit that he was entitled to 4% commissions on new business that he had not been able to sign due to his accident. The 4% rate was the first quarter commission rate that Iseman was entitled to under the 2007 plan (Iseman was injured during the first quarter of 2007). Iseman did not allege in that lawsuit that he was entitled to greater commissions or additional commissions under any alternative compensation plan, even though he had every incentive to make the largest possible claim. Similarly, in the letter that Iseman asked Woolenberg to review and sign for that lawsuit, Iseman attached the 2007 plan. He did not include any mention of additional compensation under any other plan.

In short, Iseman has failed to produce any evidence of a written or oral agreement between himself and DRI relating to compensation in 2006 or 2007 that he was not in fact paid. Defendant's motion for summary judgment on Iseman's breach of contract claim as to 2006 and 2007 compensation is GRANTED.

   *b. Microsoft Office Host*

Iseman also claims that he was not paid commissions on all aspects of the Office Host deal. He claims he was only paid for the US site of Microsoft Office Host, but was entitled to commissions on non-US sites as well. Dkt. No. 49, Ex. 2 at 77:7-8. He also claims that he was not paid for the "OEM pre-install program," where "for example, Dell would preinstall office, and when the user was requested to activate, Digital River would provide the key, provide a commission to the OEM, and pay Microsoft." *Id.* at 77:12-15. Fatal to Iseman's Office Host claims is the lack of evidence demonstrating that separate Microsoft websites existed that would entitle Iseman to commissions.

The three contracts governing Office Host provided that there would be a single website for Office Host, regardless of the end user's location. Dkt. No. 47, ¶ 7 & Ex. B. Instead of offering multiple country-specific sites, as DRI did on other occasions, DRI would simply

identify end users' IP addresses and convert the currency displayed on the website accordingly. *Id.* In addition, the contracts demonstrate that the single website would be accessible through various methods, including through the OEM Pre-install program. *Id*. at ¶ 1.5 ("End Users' may access Company's Site in one of three ways: through the Office Trial Wizard/ Office Center Application tool that resides on an End User's PC which redirects the End User to the Company site, through direct navigation to Microsoft's Office Online site, or through the 2007 Office system client software."). Iseman does not dispute that he received compensation for the U.S. website (though he disputes the amount of commission he received, as the account was secured before 2008). *See* Dkt. No. 49, Ex. 2 at 77:6-10. Since Iseman has failed to produce any evidence that additional Office Host sites existed such that he could assert a claim for compensation, DRI's motion for summary judgment on Iseman's Microsoft Office Host breach of contract claim is GRANTED.

        *c. Employee Home Use Program*

Iseman claims that he is owed commissions for the Employee Home Use Program ("EHUP") that was put into effect in 2008, 2009, and thereafter. Dkt. No. 49, Ex. 2 at 77:22-78:2. Iseman admits that he did not negotiate the terms of the EHUP contract, which was a separate addendum to the Microsoft statement of work. Instead, he argues that he negotiated the Microsoft statement of work, and procured the Microsoft business generally, which should entitle him to commissions on EHUP. *Id.* at 96:18 – 98:2.

Iseman has produced no evidence that DRI owed him a duty, contractual or otherwise, to pay him commissions on accounts that he procured, but did not negotiate. DRI has produced evidence that a different employee, Marty Paradise, negotiated and supervised the implementation of EHUP in 2009 and received commissions for that work. Dkt. No. 47, ¶ 14. Since, Plaintiff has failed to produce any evidence demonstrating that DRI owed him a duty to

pay commissions on EHUP, Plaintiff has failed make a "sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *See Celotex*, 477 U.S. at 323. DRI's motion for summary judgment on Plaintiff's EHUP breach of contract claim is GRANTED.

3. Claim for Violation of RCW 49.48.150-190

Plaintiff alleges that DRI violated RCW 49.48.150-190 because "[w]hen Defendant terminated Plaintiff's employment, Defendant refused to pay Plaintiff any commissions he earned prior to Plaintiff's termination, but for which Defendant received payment after Plaintiff's termination." Dkt. No. 27 (Amended Complaint), ¶ 42. RCW 49-48.160 provides:

> Upon termination of a contract, whether or not the agreement is in writing, all earned commissions due to the sales representative shall be paid within thirty days after receipt of payment by the principal for products or goods sold on behalf of the principal by the sales representative, including earned commissions not due when the contract is terminated.

RCW 49.48.160 applies only in the wholesale context. "Sales representative" is defined as "a person who solicits, on behalf of a principal, orders for the purchase *at wholesale* of the principal's product", and does not include "a person who sells or takes orders for the direct sale of products to the ultimate consumer". RCW 49.48.150. Similarly, "principal" is defined as a person who:

> (a) Manufactures, produces, imports, or distributes a product for sale to customers who purchase the product *for resale*;
> (b) Uses a sales representative to solicit orders for the product; and
> (c) Compensates the sales representative in whole or in part by commission.

*Id.*

Iseman claims that he is entitled to commissions going forward for sales of Microsoft Office for the Mac, or "Office Mac." Iseman claims that he was terminated "in the middle of the Office Mac launches, and there were a number of significant launches that happened since I've

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 11

been terminated." Dkt. No. 49, Ex. 2 at 121:19-22. Iseman admits, however, that Office Mac was a direct consumer store, not a wholesaling site. *Id.* at 143:19-24. Therefore, Office Mac is not subject to the statute. Iseman fails to identify any wholesale contract for which he was entitled to commissions at the time of his termination. Accordingly, he fails to produce any evidence as to an essential element of a claim under RCW 49.48.150-190. Summary judgment is GRANTED in favor of DRI on this claim.

### 4. Claim for Violation of RCW 49.52.070

An employer who "[w]illfully and with intent to deprive the employee of any part of his wages, … pay[s] any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract" is guilty of a misdemeanor. RCW 49.52.050(2). An employer who violates this statute "shall be liable in a civil action by the aggrieved employee" for twice the amount of the wages withheld in addition to attorney's fees and costs. RCW 49.52.070. As indicated above, Plaintiff has failed to produce any evidence of any statute, ordinance, or contract under which DRI was obligated to pay Plaintiff and yet failed to do so. Accordingly, Plaintiff has failed to produce evidence as to an essential element of his claim under RCW 49.52.070. Summary judgment is GRANTED in favor of DRI on this claim.

### 5. Equitable Claims

The three elements required for an unjust enrichment claim are (1) a benefit conferred on one party by another; (2) appreciation and knowledge of the benefit by the party receiving it; and (3) acceptance of the benefit under circumstances that make it inequitable for the receiving party to retain the benefit without paying its value. *See, e.g., Dragt v. Dragt/DeTray, LLC,* 139 Wash.App. 560, 576, 161 P.3d 473 (2007). "Unjust enrichment encompasses the doctrine of quantum meruit ... [they] are related doctrines; the former is a broader concept that encompasses the latter." *Id.* "Quantum meruit …is the method of recovering the reasonable value of services

provided under a contract implied in fact." *Young v. Young*, 164 Wash.2d 477, 485, 191 P.3d 1258, 1262 (2008). However, "[a] party to a valid express contract is bound by the provisions of that contract, and may not disregard the same and bring an action on an implied contract relating to the same matter, in contravention of the express contract." *MacDonald v. Hayner,* 43 Wash.App. at 85-86, 715 P.2d 519 (1986) (citing *Chandler v. Wash. Toll Bridge Authority,* 17 Wash.2d 591, 604, 137 P.2d 97 (1943)).

Here, the recovery that Plaintiff seeks – payment of compensation for work performed by DRI – is the precise subject matter of the written compensation plans that governed Plaintiff's employment. As explained above, Plaintiff has failed to produce evidence that any compensation plans other than those produced by DRI existed at the time of Plaintiff's employment. Thus, any outstanding commissions or bonuses owed to Plaintiff would be governed by the express terms of those agreements. Accordingly, Plaintiff's equitable claims fail as a matter of law and summary judgment is GRANTED in favor of DRI.

**B. Motion to Compel and Motion for Extension of Time**

Since the Court's decision on DRI's motion for summary judgment is largely based on Iseman's failure to produce evidence to support his claim, the Court finds it prudent to address Plaintiff's pending motion to compel and motion for an extension of the discovery deadline (Dkt. Nos. 38 & 40). Plaintiff's motion to compel asserts that the documents produced in response to Plaintiff's Request for Production-Set VI are unresponsive and asks the Court to compel production of all of the information requested. At issue are fifty five requests for production to Defendant. The first three requests relate to the Employee Home Use Program ("EHUP") and request (1) contracts between DRI and any other company in which EHUP was offered; (2) documents showing when EHUP sites were launched; and (3) documents showing the gross and net revenues earned by Defendant under each contract. The remaining fifty two requests consist

of four basic questions related to thirteen contracts executed between Microsoft and Defendant. With respect to those thirteen Microsoft contracts, Plaintiff asked DRI to produce (1) documents that identify every site installed or launched by DRI under each contract; (2) documents that show the date each site launched; (3) documents that show DRI's gross and net revenues from each of the launched sites; and (4) documents showing the amounts paid to Plaintiff and the basis for such payments.

Each of the requests related to EHUP pertain to damages, not liability: they seek documents that establish all EHUP contracts (to identify contracts that Iseman may be entitled commissions on), the dates that EHUP sites went live (to determine the applicable commission rate), and the amount of DRI revenues derived from EHUP clients (to ascertain the revenue number to which the commission rate is applied). Similarly, the first three requests related to the Microsoft contracts address only damages: again, they seek identification of possible sites that Iseman may be entitled to commissions on, the launch dates of each site, and the gross and net revenues earned by DRI. Since all of these requests address damages rather than liability, even if the Court had granted Plaintiff's motion to compel as to these requests, Plaintiff would be no closer to establishing a genuine dispute of material fact regarding DRI's liability.

The only requests that might touch on liability are those requests that Plaintiff made in the fourth of the repeated series of four questions related to the thirteen Microsoft contracts. In those requests for production, Plaintiff requested documents showing the amounts paid to Plaintiff and the basis for such payments. *See* Requests for Production – Set IV, Nos. 7, 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 51, & 55. Plaintiff explains that he "is looking for, among other documents, a copy of Plaintiff's 2006 Commission Compensation Plan document, which Defendant has failed to produce after numerous requests to do so, and the 2006 Rate card." Dkt.

No. 38, p. 6. However, as Plaintiff concedes, "Defendant alleges that Plaintiff did not have a commission compensation plan for 2005, 2006, and 2007, and was not paid commissions according to this method." *Id.* at 7. Indeed, DRI asserts that it "has provided all documents in its possession regarding Plaintiff's compensation, including monthly and annual commission statements, which contain launch dates and revenue information; Plaintiff's compensation agreements, as well as Digital River's standard new sales comp plan and compensation agreements for similarly situated employees, and every contract it has with Microsoft which Plaintiff played a role in procuring." Dkt. No. 43, p. 3 (citing Dkt. No. 42, ¶ 4).

The Court cannot compel a party to produce a document it does not possess. Defendant asserts that it does not have any additional compensation plans or agreements related to Plaintiff. *See* Dkt. No. 42, ¶ 4. Plaintiff provides no evidence to suggest, and the Court has no reason to believe, that DRI is not being truthful when it asserts via sworn declaration of one of its attorneys that it does not have the documents that Plaintiff seeks. *Id.* Therefore, even if the Court had granted Plaintiff's motion to compel *all* of the documents requested in its fourth set of requests for production, Plaintiff would not have evidence of additional compensation agreements that it requires to defeat DRI's motion for summary judgment.

Finally, the Court addresses Plaintiff's motion for an extension of the discovery period. Plaintiff requested that the Court extend the the date for all motions related to discovery by two months, and extend the date for completion of discovery by one month. The reasons given by Plaintiff for requesting such an extension were "1) Defendant's unwillingness to properly respond to Plaintiff's Requests for Production of Documents – Set IV, which is the subject of Plaintiff's Motion to Compel, 2) … Defendant's failing to hold a RFCP [sic] 37(a)(1) conference with Plaintiff before filing or to provide a RFCP 37(a)(1) [sic] conference certificate with, its

motion … to compel Plaintiff to answer Defendant's interrogatories, 3) Defendant's non-responsiveness in identifying appropriate FRCP 30(b)(6) persons and further documents under its control for purposes of further discovery, and 4) other ongoing discovery issues subject to discovery motion practice before this court." Dkt. No. 40, pp. 1-2.

Plaintiff fails to show good cause why the discovery deadline should be extended. Item 1 above does not require additional time as Plaintiff filed a timely motion to compel. *See* Dkt. No. 38. Item 2 does not require additional time as it should have been addressed in response to Defendant's motion to compel. Item 3 does not require additional time; Plaintiff does not explain why it was not aware of Defendant's failure to identify 30(b)(6) designees earlier in the discovery process or why his counsel could not file a motion to compel regarding that issue prior to the discovery motions deadline. Finally, item 4 is too vague for this Court to address. In short, Plaintiff does not have a basis to request a continuance of discovery deadlines. Furthermore, had the Court granted such an extension, there is no reason to believe that Plaintiff would have obtained evidence that was unavailable during the previous several months of discovery.

## IV. CONCLUSION

By not responding to DRI's motion for summary judgment, Plaintiff has failed to prosecute his case. Plaintiff was given an opportunity to demonstrate to the Court why his action should not be dismissed, and he failed to take advantage of that opportunity. *See* Dkt. No. 50 (Order to Show Cause). This alone is a basis for dismissal. *See* Fed. R. Civ. P. 41(b). However, when Plaintiff gave up on his action, Defendant had already filed a motion for summary judgment, which cannot be granted by default. *See Cristobal*, 26 F.3d at 1494-1495 & n.4. Accordingly, the Court has carefully examined each of Plaintiff's claims to determine whether

Defendant is entitled to judgment as a matter of law. The Court has also reviewed Plaintiff's pending motions to assure that the outcome on summary judgment would not have been different had the Court first ruled on Plaintiff's discovery motions. Plaintiff's failure to produce any evidence to support his claim, combined with the overwhelming evidence produced by DRI, support the Court's conclusion that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 247 (1986).

Therefore, the Court, having reviewed Defendant's Motion for Summary Judgment, the response and reply thereto, each of the declarations and exhibits, and the remainder of the record, hereby finds and ORDERS:

(1) Defendant's Motion for Summary Judgment (Dkt. No. 44) is GRANTED.

(2) Plaintiff's Motion to Compel (Dkt. No. 38), Defendant's Motion to Compel (Dkt. No. 39), and Plaintiff's Motion for Extension of Time (Dkt. No. 40) are STRICKEN as moot.

(3) This action is hereby <u>dismissed with prejudice</u>.

(4) The Clerk is directed to forward a copy of this Order to all Counsel of record.

Dated this 12 day of March 2012.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE